AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

1909 Fourth Street NW,
Albuquerque, New Mexico,
87102

)
)
)
)
)
)

Case No.    22-MR-980

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 (a)(1) | Possession with intent to distribute controlled substances |

The application is based on these facts:

See attached affidavit submitted by SA Kyle Coffey.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kyle Coffey, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_Telephonically sworn and electronically signed_ *(specify reliable electronic means)*.

Date:    06/21/2022

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico

Laura Fashing, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:

1909 Fourth Street NW, Albuquerque, New
Mexico, 87102

Case No. ___22-MR-980___

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Kyle Coffey, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 1909 Fourth Street

NW, Albuquerque, New Mexico, 87102, hereinafter "PREMISES," further described in

Attachment A, for the things described in Attachment B.

2.       I am a Special Agent (SA) with the U.S. Drug Enforcement Administration

(DEA), and have been since May 2020.  I am assigned to the DEA's Albuquerque District

Office.  As a SA for the DEA, I am an investigative law enforcement officer of the United States

within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations

of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  As a SA with DEA, I retain

the powers of enforcement as set forth in 21 U.S.C. § 878.  Prior to my employment with the

DEA, I was employed as a police officer with the Virginia Beach Police Department for

approximately 4 years. Over the course of my career, I have accumulated the following training

and experience:

a.   I graduated from the DEA Academy in Quantico, Virginia, where I received approximately 14 weeks of specialized drug-related training.  The training included controlled substance identification, drug-related investigative techniques, interview and interrogation training, preparation of search warrants, tactical applications of drug enforcement, and surveillance and electronic monitoring techniques.

b.   As a Police Officer and a DEA Special Agent, I have participated in investigations of individuals and organizations trafficking heroin, cocaine, cocaine base ("crack"), marijuana, methamphetamine, fentanyl and other controlled substances as defined in 21 U.S.C. § 801.  My experience as a Special Agent includes, but is not limited to, conducting surveillance, interviewing witnesses, participating in arrests, searches, and seizures, drafting affidavits for search warrants (to include warrants authorizing the collection of prospective cell phone location information, or "ping" warrants like this one) and criminal complaints, and working with informants.  I have participated in the investigation of several drug trafficking conspiracies.  As a result, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations (DTO) to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions.

3.   I have been involved in an ongoing investigation regarding the distribution of controlled substances, specifically methamphetamine and fentanyl, by a subject known as Robin Eugene THOMAS (THOMAS).  Since the investigation's inception, I, as well as other Special Agents and Task Force Officers with DEA and law enforcement officials from other agencies

have obtained information regarding the illegal drug trafficking activities of THOMAS.

4.     I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation.  In addition, I have developed information I believe to be reliable from additional sources including:

    a.     Information provided by Task Force Officers ("TFO"), Special Agents ("SA"), and Intelligence Research Specialists (IRS) of the DEA, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

    b.     Results of physical surveillance conducted by agents during the investigation;

    c.     Information derived from consensually recorded conversations;

    d.     A review of driver's license and automobile registration records;

    e.     Records from commercial and/or law enforcement databases; and

    f.     Records from the National Crime Information Center ("NCIC").

5.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

6.     I believe there is probable cause that THOMAS has committed, is committing, and will continue to commit offenses involving violations of, *inter alia*:

    a.     21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances;

## EVIDENCE SOUGHT DURING SEARCH

3

7.      Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

8.      Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

9.      Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

4

10.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

11.     Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

12.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband,

money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

13.     Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

14.     Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

15.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious.  They also try to secret, transfer and conceal the money by (a) placing assets in names

6

other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

16.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

17.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-

conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

18.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

19.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

20.     I know that weapons (including rifles, shotguns, and handguns) are tools of the

trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

21.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

22.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

23.     Documents showing who owns, occupies, or controls the location being searched

also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

24.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

25.     A list of items agents seek authority to seize is in Attachment B.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the PREMISES, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media.  For this reason, I submit that if a computer, digital medium, or storage medium is found

on the PREMISES, there is probable cause to believe those records will be stored on that

computer or storage medium. Thus, the warrant applied for would authorize the seizure of

electronic storage media or, potentially, the copying of electronically stored information, all

under Rule 41(e)(2)(B).

     27.    *Necessity of seizing or copying entire computers or storage media.*  In most cases,

a thorough search of a premises for information that might be stored on storage media often

requires the seizure of the physical storage media and later off-site review consistent with the

warrant. In lieu of removing storage media from the premises, it is sometimes possible to make

an image copy of storage media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

on the storage media, and to prevent the loss of the data either from accidental or intentional

destruction.  This is true because of the following:

       a.   The time required for an examination. As noted above, not all evidence takes the

           form of documents and files that can be easily viewed on site.  Analyzing

           evidence of how a computer has been used, what it has been used for, and who

           has used it requires considerable time, and taking that much time on premises

           could be unreasonable. Storage media can store a large volume of information.

           Reviewing that information for things described in the warrant can take weeks or

           months, depending on the volume of data stored, and would be impractical and

           invasive to attempt on-site.

       b.   Technical requirements.  Computers can be configured in several different ways,

           featuring a variety of different operating systems, application software, and

configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

28.    *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

29.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

    a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many

electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices

13

produced by other manufacturers have different names but operate similarly to
Face ID.

d.  In my training and experience, users of electronic devices often enable the
aforementioned biometric features because they are considered to be a more
convenient way to unlock a device than by entering a numeric or alphanumeric
passcode or password. Moreover, in some instances, biometric features are
considered to be a more secure way to protect a device's contents. This is
particularly true when the users of a device are engaged in criminal activities and
thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that
one or more digital devices will be found during the search. The passcode or
password that would unlock the device(s) subject to search under this warrant is
not known to law enforcement. Thus, law enforcement personnel may not
otherwise be able to access the data contained within the device(s), making the
use of biometric features necessary to the execution of the search authorized by
this warrant.

f.  I also know from my training and experience, as well as from information found
in publicly available materials including those published by device manufacturers,
that biometric features will not unlock a device in some circumstances even if
such features are enabled. This can occur when a device has been restarted,
inactive, or has not been unlocked for a certain period of time. For example,
Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours
has elapsed since the device was last unlocked or (2) when the device has not

14

been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.   Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers

15

(including thumbs) of any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **PROBABLE CAUSE**

### **Confidential Informant Intelligence**

30.     In June 2022, an Albuquerque Police Department Confidential Informant (CI)[1], provided information to DEA agents and Sandoval County Sherriff's Office (SCSO) deputies concerning a subject known as Robin Eugene THOMAS. The CI identified THOMAS as a large-scale distributor of fentanyl pills and methamphetamine in the Albuquerque, New Mexico area. The CI stated that THOMAS lives at the PREMISES, which also serves as his stash house, where he keeps pound quantities of methamphetamine and thousands of fentanyl pills. The CI stated that THOMAS' residence/stash house is the PREMISES and THOMAS conducts illegal narcotics sales out of the PREMISES. Agents are aware that the CI has contacted THOMAS via cellular phone in June 2022.

31.     In June 2022, agents have conducted surveillance of the PREMISES. Agents have

---

[1] The CI has been established to be credible and reliable by Agents of the DEA, APD, and SCSO.  To date, DEA agents, APD detectives, and SCSO Deputies have not found the CI to be untruthful. The CI is cooperating with the investigation for consideration on state charges of receiving/transferring stolen motor vehicle. CI is currently on NM State probation and has been arrested for felony charges, including most recently felon in possession of a firearm, possession of a stolen vehicle, and possession of a controlled substance.

observed a vehicle parked near the PREMISES which has been occupied by several individuals.

Based on the fact that these individuals are never observed to be engaged in any activity other

than being present in the parked vehicle, Agents believe the individuals in the vehicle are

lookouts present at the PREMISES to protect THOMAS and the PREMISES. Additionally, the

PREMISES appears to be away from the street and there is limited access to the PREMISES

which is generally surrounded by fencing, vehicles, and other obstacles which appear to be

purposefully situated in an effort to obstruct outside view of and access to the PREMISES.

Agents have also observed foot and vehicle traffic into and around the PREMISES which

appears consistent with drug trafficking being conducted out of the PREMISES.

      32.     THOMAS has several prior convictions involving the trafficking of narcotics, to

include convictions for: (1) Trafficking (by Manufacturing)(Methamphetamine), a second degree

felony committed on or about July 30, 2013, as charged in D-202-CR-2013-03836, (2)

Trafficking (by Possession with Intent to Distribute)(Methamphetamine), a second degree

felony committed on or about April 7, 2014 as charged in D-202-CR-2014-01863, and (3)

Possession of a Controlled Substance, a fourth degree felony committed on or about December 8,

2005 in D-202-CR-2005-05743.

### CI Controlled Buy/Walk from THOMAS

      33.     In June 2022[2], the CI, met agents at a predetermined location. Agents searched the

CS and found no contraband. The CS was given official advanced funds (OAF) to purchase

---

[2] The exact date of the controlled buy in not indicated due to concerns for the CS's safety

narcotics[3]. Surveillance followed the CS from the predetermined location to the PREMISES. Agents observed the CS enter the PREMISES.

34.    Inside the PREMISES, the CS met with THOMAS. The CS gave THOMAS the OAF. THOMAS then sold the CS methamphetamine[4]. The CS and THOMAS discussed additional, future narcotics deals.

35.    Agents observed the CS and THOMAS walk from the PREMISES. Agents observed the CS depart from the PREMISES and followed the CS to a predetermined location. At the location, agents collected the purchased methamphetamine. Agents conducted a search of the CS, which yielded no contraband.

36.    Agents maintained custody of the purchased methamphetamine and conducted a field test of the purchased methamphetamine. The field test indicated presumptive positive for methamphetamine.

37.    Based on my training and experience, the amounts of methamphetamine believed to be stored and/or sold at the PREMISES by THOMAS are consistent with distribution, not personal use.

38.    Based on all of the facts related above, there is probable cause to believe that THOMAS distributes and possesses with intent to distribute controlled substances, specifically

_____

[3] The exact amount of OAF is not indicated due to concerns for the CS's safety

[4] The exact amount of purchased methamphetamine is not indicated due to concerns for the CS's safety

methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

## CONCLUSION

39.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Kyle Coffey
Special Agent
U.S. Drug Enforcement Administration

Electronically signed and telephonically
sworn on June 21, 2022:

HONORABLE Laura Fashing
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A

*Property to be searched*

The property to be searched is 1909 Fourth Street NW, Albuquerque, New Mexico, 87102, hereinafter "PREMISES."  Specifically, the location to be searched is a structure/residence near the Northwest corner of the greater 1909 Fourth Street NW, Albuquerque, New Mexico property. The PREMISES appears to be a single story structure. The exterior of the PREMISES appears to be light brown in color. The exterior of the PREMISES appears to be metal siding. There appears to be a brown colored garage door, which opens to the East. Above the garage door, there appears to be a white, retractable canopy. There appears to be a door, attached to the East most section of the PREMISES, which opens to the South. The approximate GPS coordinates are: 35.10383, -106.64844.

The search of the above PREMISES shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the PREMISES, and all persons located in the PREMISES in or on which the items to be seized could be concealed.  The search shall also include all vehicles parked at, or in front of, the PREMISES that have an apparent connection to the PREMISES and/or THOMAS. Connection to the vehicle may be established by evidence that anyone residing at the PREMISES and/or THOMAS may own, operate, and/or have access to any vehicle parked at or in front of the PREMISES. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Two photographs of the PREMISES are included below:





3

**ATTACHMENT B**

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 841(a)(1), that being distribution and possession with intent to distribute a controlled substance, those violations involving THOMAS, including:

1. Controlled substances, including methamphetamine, heroin, fentanyl, cocaine, and marijuana.

2. Drug paraphernalia, including scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

8. Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including utility bills, cancelled checks, or envelopes and deeds or leases.

9. Indications of ownership or control over any vehicles located at the place to be searched, including titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

If any electronic devices are seized during the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to press or swipe the fingers (including thumbs) of THOMAS or any resident of the PREMISES to the fingerprint scanner of any such electronic devices, and to hold such devices in front of THOMAS's face or the face of any resident of the PREMISES to activate the facial recognition or iris recognition feature for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.